**The FALKIRK MINING COMPANY, an Ohio corporation, Appellant/Cross-appellee,**

v.

**The JAPAN STEEL WORKS, LIMITED, a corporation of Japan, and Japan Steel Works America, Inc., a New York corporation, Appellees/Cross-appellants.**

**Nos. 89–5189, 89–5207.**

United States Court of Appeals, Eighth Circuit.

Submitted March 16, 1990.

Decided June 26, 1990.

Rehearing Denied Aug. 10, 1990.

David S. Evinger, Minneapolis, Minn., for appellant/cross-appellee.

William L. Killion, Minneapolis, Minn., for appellees/cross-appellants.

Before McMILLIAN and BEAM, Circuit Judges, and LARSON,* Senior District Judge.

McMILLIAN, Circuit Judge.

The Falkirk Mining Co. (Falkirk) appeals from a final judgment entered in the United States District Court for the District of North Dakota granting the motion to dismiss of Japan Steel Works, Ltd. (Japan Steel), and Japan Steel Works America, Inc. (collectively appellees), on the grounds that Falkirk had failed to state a claim upon which relief could be granted. Appellees cross-appeal from the district court's holding that it could exercise personal jurisdiction over them consistent with due process. We reverse the district court's decision that it possessed personal jurisdiction over appellees, and remand this action to the district court with directions to dismiss the complaint for lack of personal jurisdiction. Falkirk's appeal is dismissed as moot.

## I.

On May 27, 1974, Falkirk's parent corporation, the North American Coal Co., an Ohio corporation, entered into a contract with Marion Power Shovel (Marion), a Delaware corporation with its principal place of business in Ohio, for the purchase and construction of a walking dragline crane (drag-line) to be used in strip mining coal. Marion does not manufacture all of the component parts for its draglines.[1] In 1976, Marion agreed to purchase six eccentric cams needed for three draglines from Mitsui & Co. (U.S.A.), Inc. (Mitsui U.S.A.), the American subsidiary of Mitsui & Co., Ltd. (Mitsui), a major Japanese trading company. Mitsui then contracted with Japan Steel, a foreign corporation incorporated under the laws of Japan,[2] to manufacture the six cams.[3] Through Mitsui U.S.A., Marion provided Japan Steel with drawings and specifications for the manufacture of the cams. Two of the six eccentric cams Marion ordered were designated for use in the construction and erection of the dragline at the Falkirk Mine.

Marion officials monitored Japan Steel's manufacturing process in Japan to insure compliance with contract specifications and timeliness requirements. Marion officials visited Japan Steel in Japan on three occasions between July 1976 and April 1977. Marion's vice-president of materials visited Japan Steel's production facilities in July 1976. Two months later, two other Marion officials met with Japan Steel officials in Japan to discuss the manufacture of the eccentric cams. On April 4, 1987, a Marion official inspected some samples of Japan Steel's finished work product in Japan.

In October 1978, Japan Steel completed and delivered eccentric cam no. 287C39, the subject of this litigation, to Mitsui in Japan. Mitsui or Mitsui U.S.A. then completed the sale of the cam to Marion. Mitsui U.S.A. transported the cam to Kobe, Japan, where an agent for Marion took delivery. Marion's agent then shipped the cam from Kobe to Seattle, Washington. Another Marion agent then transported the cam

---

\* The Honorable Earl R. Larson, Senior United States District Judge for the District of Minnesota, sitting by designation.

1. The dragline is an enormous piece of machinery. It weighs about 13.5 million pounds and stands over 17 stories high. The dragline "walks" by the use of two walking shoes and two arms. Each walking shoe is mounted to a walking arm which, in turn, is mounted to an eccentric cam. The eccentric cam functions as a joint, allowing the arm to lift the dragline and propel it forward about 7 feet per "step."

2. Japan Steel Works America, Inc., the American subsidiary of Japan Steel, is a New York corporation.

3. Falkirk has alleged common ownership of Japan Steel and Mitsui. By way of an affidavit filed in the district court, the general manager of Japan Steel's General Affairs Department testified that no common ownership interest of any kind exists between Mitsui and Japan Steel.

from Seattle to North Dakota. Marion paid the cost of shipping the cam from Japan to Seattle and from Seattle to North Dakota.

In June 1979, Marion began constructing the dragline at the Falkirk Mine in North Dakota. The dragline was completed eighteen months later and was put into operation on December 23, 1980. The dragline functioned without incident until December 15, 1985, when eccentric cam 287C39 cracked. Independent metallurgical tests concluded that the crack was caused by improper welding and casting during the manufacturing process. Falkirk allegedly sustained approximately $500,000 damage as a result of the failure, about $426,000 of which was damage to the cam or the dragline's other component parts.

On September 22, 1988, Falkirk filed the instant diversity action against Japan Steel in federal district court, alleging causes of actions for breach of implied and express warranties, negligence, and strict liability. Appellees moved to dismiss on the grounds that the district court lacked personal jurisdiction and that Falkirk had failed to state a claim upon which relief could be granted.[4] Falkirk opposed the motion and moved for leave to amend the complaint to substitute Mitsui and Mitsui U.S.A. as defendants in place of Japan Steel Works America. On February 2, 1989, the district court found that it possessed personal jurisdiction over appellees, but granted appellees' motion to dismiss because Falkirk could not recover under any of the theories raised. Falkirk's motion for reconsideration was denied. The district court denied Falkirk's motion for leave to file an amended complaint.[5] This timely appeal and cross-appeal followed.

## II.

On appeal, Falkirk argues that the district court erred in dismissing its complaint for failure to state a claim. Falkirk contends that the defective cam damaged other property when it cracked and its damages are fully recoverable in tort under North Dakota law. Falkirk further contends that the district court erred in holding that its breach of warranty claim was barred by the statute of limitations. Appellees respond that the district court correctly dismissed Falkirk's complaint for failure to state a legally cognizable claim, but erred in holding that it could assert personal jurisdiction over them consistent with due process. Appellees contend that we need not reach its cross-appeal on the jurisdiction issue if we affirm the district court's dismissal of Falkirk's complaint for failure to state a cognizable claim. We disagree. Before a district court can reach the merits of a dispute and enter legally binding orders, it must determine as a threshold matter whether it possesses personal jurisdiction over the defendants. " '[T]he question of jurisdiction is always vital.' " *Land–O–Nod Co. v. Bassett Furniture Industries, Inc.*, 708 F.2d 1338, 1340 (8th Cir.1983) (*Land–O–Nod*) (quoting *Eighth Regional War Labor Board v. Humble Oil & Refining Co.*, 145 F.2d 462, 464 (5th Cir.1944), *cert. denied*, 325 U.S. 883, 65 S.Ct. 1577, 89 L.Ed. 1998 (1945)). Whether the district court properly exercised personal jurisdiction over appellees requires consideration of a two-part inquiry. We must first determine whether North Dakota's long-arm statute authorized the exercise of jurisdiction over appellees.[6] If so, we must then decide whether

4. In its Memorandum in Support of its Motion to Dismiss, Japan Steel also argued that its subsidiary, Japan Steel Works America, Inc., had no involvement in the manufacture, sale, and distribution of the cam, and that Mitsui or Mitsui U.S.A. was the entity responsible for the distribution of the cam.

5. Falkirk has not raised as an issue on appeal the district court's denial of its motion for leave to file an amended complaint.

6. Because the jurisdiction of the district court in this case is based on diversity of citizenship, *see* 28 U.S.C. § 1332(a), we look to the law of the forum state to determine if the non-resident appellees are amenable to service of process outside of the state. *See* Fed.R.Civ.P. 4(e); *Omni Capital Int'l v. Rudolf Wolff & Co.*, 484 U.S. 97, 105, 108 S.Ct. 404, 410, 98 L.Ed.2d 415 (1987) ("under Rule 4(e), a federal court normally looks either to a federal statute or to the long-arm statute of the State in which it sits to determine whether a defendant is amenable to

the district court's exercise of personal jurisdiction violated the due process clause of the fourteenth amendment.

### A.

▮ The district court found that North Dakota's long-arm statute authorized the exercise of jurisdiction over appellees. We cannot conclude that this holding constitutes reversible error.[7] North Dakota's long-arm statute permits the exercise of jurisdiction over a person who commits a tort within or without the state causing injury to another person or property within the state. N.D.R.Civ.P. 4(b)(2)(C).[8] Once a defendant has challenged a federal court's jurisdiction, the plaintiff bears the burden of proving that jurisdiction exists. *Scullin Steel Co. v. National Ry. Utilization Corp.*, 676 F.2d 309, 311 (8th Cir.1982); *Aaron Ferer & Sons Co. v. Diversified Metals Corp.*, 564 F.2d 1211, 1215 (8th Cir. 1977). In order to satisfy its burden of proving that N.D.R.Civ.P. 4(b)(2)(C) authorizes the exercise of jurisdiction over appellees, Falkirk need not prove that appellees committed a tort, its substantive cause of action, by a preponderance of the evidence. Rather, Falkirk meets its burden as to the first prong of the personal jurisdiction test "by establishing merely a *prima facie* cause of action." *Jetco Electronic Industries, Inc. v. Gardiner*, 473 F.2d 1228, 1232 (5th Cir.1973). Falkirk alleges that Japan Steel's negligent casting and welding of the eccentric cam caused it to crack and damage the dragline, property within the state. Without deciding whether North Dakota would in fact permit Falkirk to recover damages in tort for the failure of the cam, we hold that the North Dakota long-arm statute authorizes the exercise of jurisdiction because Falkirk has alleged a *prima facie* cause of action in tort sufficient to bring appellees within the ambit of N.D.R.Civ.P. 4(b)(2)(C).[9]

### B.

▮ We next consider whether the district court erred in holding that due process was not violated by subjecting appellees to personal jurisdiction. For the reasons stated below, we hold that the district court erred in holding that appellees could be subjected to personal jurisdiction consistent with due process.

▮ The due process clause limits the power of a state to assert personal jurisdiction over a nonresident defendant. *Helicopteros Nacionales De Columbia, S.A. v. Hall*, 466 U.S. 408, 413–14, 104 S.Ct. 1868, 1871–72, 80 L.Ed.2d 404 (1984). A state may exercise personal jurisdiction over a nonresident defendant consistent with due process when the defendant has "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington*, 326 U.S. 310, 316,

---

service, a prerequisite to its exercise of personal jurisdiction").

**7.** Appellees apparently concede on appeal that North Dakota's long-arm statute authorizes the exercise of jurisdiction over them. Although appellees have cross-appealed the district court's holding on personal jurisdiction, they take issue only with its holding that the exercise of jurisdiction over them does not offend due process. Appellees do not challenge the district court's holding that Falkirk had satisfied the first prong of the personal jurisdiction test.

**8.** N.D.R.Civ.P. 4(b)(2)(C) provides:

(2) **Personal jurisdiction based upon contacts.** A court of this state may exercise personal jurisdiction over a person who acts directly or by agent as to any claim for relief arising from the person's having such contact

with this state that the exercise of personal jurisdiction over him does not offend against traditional notions of justice or fair play or the due process of the law, under one or more of the following circumstances:

....

(C) committing a tort within or without this state causing injury to another person or property within this state.

**9.** We express no opinion on whether North Dakota law permits Falkirk to recover damages in tort for the cracking of the cam itself or whether it would limit Falkirk to contract remedies. *See East River S.S. Corp. v. Transamerica Delaval Inc.*, 476 U.S. 858, 870–73, 106 S.Ct. 2295, 2301–03, 90 L.Ed.2d 865 (1986) (when a party alleges injury only to a product itself resulting in purely economic loss, the injured party may allege a cause of action in contract, but not in tort).

66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S.Ct. 339, 342, 85 L.Ed. 278 (1940)). The Supreme Court has held that in order to exercise personal jurisdiction, "it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958) (*Hanson*). While purposeful availment by the defendant is a necessary condition for the exercise of personal jurisdiction, it is not always sufficient. In certain unusual cases, the "minimum requirements inherent in the concept of 'fair play and substantial justice' may defeat the reasonableness of jurisdiction even [though] the defendant has purposefully engaged in forum activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477–78, 105 S.Ct. 2174, 2184–85, 85 L.Ed.2d 528 (1985) (*Burger King*) (quoting *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292, 100 S.Ct. 559, 564, 62 L.Ed.2d 490 (1980) (*World–Wide Volkswagen*)). The Supreme Court recently held that in addition to determining whether a defendant has purposefully established minimum contacts with the forum state, courts must also examine the burden on the defendant, the interests of the forum state in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several states in furthering fundamental substantive social policies. *Asahi Metal Industry Co. v. Superior Court*, 480 U.S. 102, 113, 107 S.Ct. 1026, 1033, 94 L.Ed.2d 92 (1987) (*Asahi*); *see Burger King*, 471 U.S. at 476–77, 105 S.Ct. at 484–85; *World–Wide Volkswagen*, 444 U.S. at 292, 100 S.Ct. at 564.

Prior to *Asahi*, this circuit incorporated several of these jurisdictional considerations into a five-part test. In determining whether a district court possesses personal jurisdiction over a non-resident defendant, we have examined the following factors:

(1) the nature and quality of the contacts with the forum state; (2) the quantity of the contacts with the forum state; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) the convenience of the parties.

*Land–O–Nod*, 708 F.2d at 1340. The district court applied the *Land–O–Nod* test and found that the exercise of jurisdiction would not offend due process. The district court first considered the nature and quality of the contacts with the forum state. The district court found that only two contacts were alleged to have occurred between the forum state and the defendants. *Falkirk Mining Co. v. Japan Steel Works, Ltd.*, Civil No. A1–88–211, slip op. at 6 (D.N.D. Feb. 2, 1989) (*Falkirk Mining Co.*). The first contact concerned the sale of plastic injection machines to the Minnesota Mining & Manufacturing Company, and their installation at a 3M plant in North Dakota. *Id.* The district court properly found that "[t]he contact arising out of the sale and installation of the plastic injection machines is wholly unrelated to the present action and [was] therefore insignificant." *Id.* at 7. The second contact arose from Marion's incorporation of the defective cam into the dragline at the Falkirk Mine. The district court found that Marion's incorporation of the cam into the dragline, which ultimately gave rise to this lawsuit, was highly significant. The district court held that factors one and three of the *Land–O–Nod* test were satisfied because Falkirk's "cause of action can be traced from the defective manufacture of the eccentric cam by [appellees], through the distribution chain, to the seller of the machine and its assembly up until the time the eccentric cam apparently malfunctioned and caused the damages complained of." *Id.* The district court found the fourth *Land–O–Nod* factor favored the exercise of jurisdiction because "the state of North Dakota would have a very strong interest in providing [Falkirk] with a forum, at least if Marion were a defendant." *Id.* at 7. Turning to the fifth *Land–O–Nod* factor, the district

court held that "[c]onvenience to the parties is not a problem in the court's eyes." *Id.*

We disagree with the district court's conclusion that the exercise of jurisdiction over appellees does not offend due process. This case is factually analogous to the Supreme Court's decision in *Asahi.* In *Asahi,* the California Supreme Court concluded that personal jurisdiction could be exercised over Asahi, a Japanese manufacturer of tire valves, because Asahi knew that one of the buyers of the valves would incorporate them into tire tubes sold in California. 480 U.S. at 108, 107 S.Ct. at 1033. The state supreme court found that Asahi's intentional act of placing its components in the stream of commerce, coupled with the awareness that some of its components would end up in California, was a sufficient basis for personal jurisdiction. *Id.* The United States Supreme Court reversed. A plurality of the Court found that Asahi's mere placement of the tire valves within the stream of commerce did not constitute an act of purposeful availment towards the forum state. *Id.* at 112, 107 S.Ct. at 1033. A unanimous Court held that the substantial burden on the nonresident defendant, when weighed against the relatively lesser interests of the plaintiff and the forum state, precluded the exercise of jurisdiction consistent with due process. *Id.* at 114–15, 107 S.Ct. at 1034. In the present case, Japan Steel is a Japanese corporation and Japan Steel Works America is a New York corporation. Aside from one isolated, unrelated visit by Japan Steel engineers to North Dakota to install plastic injection machines at a 3M plant, neither Japan Steel nor Japan Steel Works America has purposefully availed itself of the laws and protections of the State of North Dakota. Like the tire valve manufacturer in *Asahi,* neither company has an office, agents, employees, or property in the state. Like the manufacturer in *Asahi,* neither company advertises or otherwise solicits business in North Dakota. Like *Asahi,* neither company created, controlled, or employed the distribution system that brought the cams to North Dakota. *See id.* at 112, 107 S.Ct. at 1033.

We do not believe that *Marion's* incorporation of cam 287C39 into the dragline at the Falkirk Mine in North Dakota is sufficient in and of itself to subject Japan Steel and Japan Steel Works America to personal jurisdiction. Japan Steel's contractual relationship was with Mitsui and Mitsui U.S.A., not Falkirk. Japan Steel manufactured the cams in accordance with specifications drawn up and provided by Marion, not Falkirk. In a sworn affidavit, Jerry M. Cornwell, Marion's vice-president of materials, admitted that "[a]ll drawings and specifications furnished by Marion ... to Japan Steel for the manufacture of the eccentric cams were proprietary information to Marion...." App. at 182. Furthermore, Marion monitored Japan Steel to insure compliance with technical specifications and timeliness requirements. Marion officials, not Falkirk officials, visited Japan Steel in Japan on three occasions to oversee the manufacture of the cams. Japan Steel then sold the cams to Mitsui or Mitsui USA, which in turn sold them to Marion. Marion took delivery of the cams in Japan, and then arranged and paid for the shipping from Japan to Seattle and Seattle to North Dakota.

The record is devoid of evidence of minimum contacts between appellees and the State of North Dakota. Japan Steel officials never visited North Dakota to inspect the Falkirk Mine, negotiate a contract of sale, or discuss design specifications. Japan Steel dealt strictly with Mitsui and Marion. Japan Steel manufactured the cams for purchase by Mitsui in accordance with specifications provided by Marion. There is no evidence that Japan Steel knew it was manufacturing the cams for ultimate installation in a dragline in North Dakota. For all Japan Steel knew, Marion could have installed the cams into draglines at any number of locations in the United States or abroad.

Unless it can be shown that appellees purposefully directed their activities towards North Dakota, the mere fact that Marion brought two of the cams it purchased from Japan Steel into North Dakota does not justify the exercise of personal

jurisdiction over appellees. "[T]he mere 'unilateral activity of those who claim some relationship with a non-resident defendant cannot satisfy the requirement of contact with the forum State.'" *World–Wide Volkswagen*, 444 U.S. at 298, 100 S.Ct. at 567 (quoting *Hanson*, 357 U.S. at 253, 78 S.Ct. at 1239). By selling the cams to Marion, Japan Steel did nothing more than place its products in the stream of commerce. Like the nonresident defendant in *Asahi*, appellees' placement of a product into the stream of commerce, without more, does not constitute an act of the defendant purposefully directed toward the forum State. 480 U.S. at 112, 107 S.Ct. at 1033 (plurality).

▄▄▄ Turning to the final two factors of the *Land–O–Nod* test, we agree with the district court that the fourth *Land–O–Nod* factor favors the exercise of jurisdiction because North Dakota has an interest in providing its residents with a forum. *Falkirk Mining Co.*, slip op. at 7. However, North Dakota's interest in providing Falkirk with a forum cannot make up for the absence of minimum contacts. As for the fifth *Land–O–Nod* factor, we disagree with the district court's conclusion that "[c]onvenience to the parties is not a problem in the court's eyes." *Id.* In *Asahi*, the Supreme Court noted that severe burdens were imposed on nonresident foreign defendants by subjecting them to personal jurisdiction. The Court held that "[t]he unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders." 480 U.S. at 114, 107 S.Ct. at 1034. *See* Maltz, *Unraveling the Conundrum of the Law of Personal Jurisdiction: A Comment on Asahi Metal Industry Co. v. Superior Court of California*, 1987 Duke L.J. 669, 690 ("*Asahi* suggests . . . a greater volume of additional connec-

tions is required to justify the exercise of jurisdiction over the citizens of a foreign nation"). When summarily concluding that convenience to the parties was not a problem, the district court failed to give appropriate weight to the substantial travel, legal, and financial burdens that Japan Steel would face in defending itself in North Dakota.[10]

The additional *Asahi* factors not embodied in the *Land–O–Nod* test also support our finding that no personal jurisdiction exists over appellees. As the plaintiff, Falkirk does have an interest in obtaining relief. However, this interest is best vindicated by an action against Marion, the party with whom it shared a direct contractual relationship. *See Asahi*, 480 U.S. at 114, 107 S.Ct. at 1034. The record does not clearly reflect why Falkirk has failed to sue Marion for incorporation of the defective cam into the dragline. Perhaps such a claim exists. The final two *Asahi* factors, the interests of the several states in obtaining the efficient resolution of disputes and the advancement of substantive policies, do not favor the exercise of personal jurisdiction here because a foreign corporation is at issue. In *Asahi*, the Supreme Court noted that the procedural and substantive policies of other nations, as well as the federal government's interest in foreign relations, must again counsel caution in the exercise of personal jurisdiction over alien defendants. *Id.* at 115, 107 S.Ct. at 1034. The careful inquiry we are required to make before exercising jurisdiction over foreign defendants supports our conclusion that no personal jurisdiction exists here, especially given the absence of minimum contacts between appellees and the State of North Dakota.

Because of the absence of minimum contacts between appellees and the State of North Dakota, we hold that the district court erred in subjecting them to personal jurisdiction. Accordingly, we reverse the

**10.** Because Japan Steel Works America is a New York corporation, it would not face the same burdens as Japan Steel if it were required to defend itself in North Dakota. However, Japan Steel America was not incorporated until August 15, 1978, less than two months before Ja-

pan Steel delivered the cam to Mitsui in Japan. Falkirk apparently concedes that Japan Steel Works America had no connection with the manufacture, sale, or distribution of the defective cam.

judgment of the district court and remand this cause to the district court with directions to dismiss the case for lack of personal jurisdiction. We need not decide whether the district court erred in granting appellees' motion to dismiss for failure to state a claim upon which relief could be granted. Falkirk's appeal is dismissed as moot.